**Francis SPERANDEO, Regional Director of the Twenty-Seventh Region of the National Labor Relations Board, for and on BEHALF of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NORTHERN COLORADO BUILDING TRADES COUNCIL; Carpenters District Council of Denver and Vicinity; and Carpenters District Council of Southern Colorado, Respondents.**

Civ. A. No. C–1788.

United States District Court
D. Colorado.

Oct. 23, 1969.

Robert L. McCabe, National Labor Relations Board, Denver, Colo., for petitioner.

Robert G. Good, Denver, Colo., for Kansas Quality Construction Co., Inc.

Wayne D. Williams, Philip Hornbein, Jr., Denver, Colo., for respondents.

## FINDINGS OF FACT, CONCLUSIONS OR LAW, OPINION AND ORDER

CHILSON, District Judge.

This is an action filed by the National Labor Relations Board for injunctive relief against the respondents pending the final disposition by the Board of an alleged labor dispute. The action is brought pursuant to Section 10(*l*) of the National Labor Relations Act. (29 U.S.C.A. § 160(*l*))

On October 6, 1969, this Court entered a temporary restraining order, restraining the respondents from further activity concerning the subject matter of the dispute, until the matter could be heard on its merits. On October 13, 1969, the Court held an evidentiary hearing, and the Court having considered the evidence, argument of counsel and the briefs filed by the parties, concludes that the petition for a preliminary injunction should be granted.

## FINDINGS OF FACT

1. Petitioner is regional director of the 27th region of the National Labor Relations Board, an agency of the United States, and has filed this petition on behalf of the Board.

2. Jurisdiction is invoked pursuant to Section 10, Section 10(*l*) of the National Labor Relations Act, 29 U.S.C.A. § 160(*l*).

3. On or about September 17, 1969, Kansas Quality Construction, Inc., (Kansas) filed charges with the Board alleging that the respondents are labor organizations which have engaged in or are engaging in unfair labor practices, within the meaning of Section 8(b) (4) (i) (ii) (B) of the Act. On September 22, 1969, the charges were amended.

4. The charges were referred to the petitioner as regional director, who determined that a complaint should issue pursuant to Section 10(b) of the Act.

5. Kansas is a contractor in the building and construction industry, and is engaged in constructing housing projects in or near Denver, Colorado, Colorado Springs, Colorado, Topeka, Kansas and Kansas City, Missouri. The Colorado Springs project is known as Kingsborough Apartments, the Denver project as Briarwood North, and the Kansas City project as Knollwood Apartments.

6. Kansas' method of operation was to subcontract all of its work. Except in its Colorado operations, Kansas had issued subcontracts only to those who employed union labor. On the Colorado projects, Kansas subcontracted without reference to whether or not the subcontractors employed union labor, some did, and some did not.

7. In June of 1969, a business representative of the Carpenters Union talked to Kansas' project manager on the Briarwood project and complained that the subcontractor doing the "forming work" was hiring non-union labor. At the request of the union representative, the project manager arranged for a meeting between the union representative and the "forming" subcontractor. At this meeting, the union representative insisted that the subcontractor go union. Some days after this conversation and on or about July 8, the job was picketed by the District Council of Denver, and the carpenters left the job.

8. At a meeting between Kansas and representatives of the carpenters union on July 10, the union representatives stated that the forming contractor had to put union men on the job or the carpenters would not work, and if this demand was not complied with, the job would be picketed. The forming subcontractor (Statewide) terminated its forming contract, the picket left the job, and the forming subcontract was left to another subcontractor, A. S. Dode.

9. During the month of August, conversations were had between Kansas and representatives of the respondents in an attempt to get Kansas, in its Colorado operations, to deal only with those subcontractors who would hire union labor, and Kansas was informed by a representative of the carpenters union that he wanted the entire job at Briarwood to be union. Kansas refused to terminate its existing subcontracts and on September 15, the Briarwood project was picketed and on September 16, the Kingsborough Apartment and the Knollwood projects were picketed.

10. On September 17, 1969, a representative of the Northern Colorado Building Trades Council met in Kansas City with representatives of Kansas. The building trades representative stated that the picketing on the Knollwood project was because Kansas was operating nonunion in Denver and Colorado Springs. Kansas refused to discuss the matter while picketed. The picket was removed and a second meeting was had the next day at which the Building Trades Council representative presented an agreement that Kansas would require all subcontractors to be represented by the appropriate craft union. Kansas replied that it could not break its existing agreements with subcontractors as long as they were performing their work properly. After further discussion and for the first time since the picketing began in June, the Building Trades representative stated that if Kansas would sign the agreement tendered to it and do so immediately, the Building Trades Council would agree to exclude the Briarwood and Kingsborough projects from the coverage of the agreement. When asked about his authority to make this modification of the agreement, the representative said that he did not have the authorization, but was sure that this recommendation would be followed. Kansas stated that it would like to consider the matter and have another meeting to discuss it further, but was advised that Kansas must either execute the agreement then or picketing would be resumed on all jobs, and on all future jobs. Kansas refused to execute the agreement as tendered. The agreement as tendered did not exclude the Briarwood and Kingsborough projects.

11. On September 19, picketing was resumed on the Knollwood project, on September 22, on two Kansas projects located in Topeka, Kansas, on September 23, on Briarwood project and continued to October 6, 1969, when the temporary restraining order was issued. As a result of the picketing, the Topeka, Kansas, projects and the Knollwood project were closed down. The picketing at the Kingsborough project was resumed on September 16 and continued for three days.

12. The respondents' sole purpose in picketing the Colorado projects from June of 1969 to September 18, 1969, was to require Kansas to require all of its subcontractors on the Colorado projects to employ union labor and to require Kansas to terminate those subcontracts on the Colorado projects where the subcontractor refused to so agree.

13. Since September 18, 1969, the respondents have picketed for the same purpose and also to obtain an agreement with Kansas that on future projects, it would subcontract only with those subcontractors who agreed to employ union labor.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties to and the subject matter of this proceeding, and under Section 10(*l*) of the Act is empowered to grant injunctive relief.

2. The respondents are labor organizations within the meaning of the Act and there is, and petitioner has, reasonable cause to believe that they have engaged in unfair labor practices within the meaning of Section 8(b) (4) (i) (ii) (B) of the Act.

3. To preserve the issues for orderly determination as provided in the Act, to protect the public welfare, and to prevent irreparable injury, it is appropriate, just and proper that, pending final disposition of the matters herein which are before the Board, respondent, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with them be enjoined and restrained from the commission, continuation, or repetition of the acts and conduct set forth in the Findings of Fact or like or related acts and conduct, the commission of which in the future is likely or may fairly be anticipated from the respondents' acts and conduct in the past.

## OPINION

The pertinent parts of the Act are here set forth:

Section 158(b) (4) (A) & (B) of the Act (29 U.S.C., Section 158) provides:

"It shall be an unfair labor practice for a labor organization or its agents—

\*  \*  \*  \*  \*  \*

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(A) forcing or requiring any employer \* \* \* to enter into any agreement which is prohibited by subsection (e) of this section;

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, \* \* \* Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing \* \* \*.

Section 8(e) of the Act, referred to in Section 8(b) (4) (A) above, provides, in part, as follows:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work \* \* \*."

The Court, in arriving at its conclusions that there is reasonable ground to hold that the respondents have engaged in an unfair labor practice is based on the construction of the Act by the Sixth Circuit Court of Appeals in N.L.R.B. v. International Bro. of Elec. Wkrs., Loc. U. No. 683, 359 F.2d 385 (1966). The facts of that case and the present case are quite similar. Merchandise Properties, Inc., as a general contractor, hired subcontractors to erect a warehouse.

Five of the nine had contracts with unions, while four were nonunion. The Trades Council told Merchandise it should use only union contractors on the job. The job was picketed and the work at the job site halted. Merchandise then sent letters to the four nonunion subcontractors informing them their contracts had to be cancelled because of the labor trouble. An unfair labor practice suit was filed against the respondent and four other labor organizations. Upon these facts, the Board found that the respondent violated 29 U.S.C. § 158(b) (4) (i) and (ii) (B), 8(b) (4) (B) of the Act.

The Court, in sustaining the Board, stated:

"(1) In the construction industry, picketing at the construction site to secure an agreement with the general contractor which provides that all construction work will be done with construction labor agreeable to affiliated local Unions of the Columbus Building and Construction Trades Council is permissible under 29 U.S.C., Section 158(e), 8(e) of the Act. Construction, Production and Maintenance Labor Union, Local 323 v. National Labor Relations Board, 323 F.2d 422 (C.A.9, 1963); Orange Belt District Council of Painters [No. 48, A.F.L.–C.I.O.] v. National Labor Relations Board, 117 U.S.App.D.C. 233, 328 F.2d 534 (1964).

"However, under Section 8(b) (4) (B) of the Act, such agreements, commonly known as "hot cargo" agreements, may be enforced only through lawsuits, not through economic action. Local 1976, United Brotherhood of Carpenters and Joiners of America Union v. National Labor Relations Board (Sand Door case), 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958); Orange Belt District Council of Painters [No. 48, A.F.L.–C.I.O.] v. National Labor Relations Board, supra;

Building and Construction Trades Council of San Bernardino and Riverside Counties v. National Labor Relations Board, 117 U.S.App.D.C. 233, 328 F.2d 540 (C.A.D.C.1964); I and II Legislative History of the Labor Management Reporting and Disclosures Act of 1959 at 943 and 1433.

"(2) Here the picketing had the dual purpose of seeking an agreement and requiring an employer to cease doing business with another person. The addition of a contractual demand to a cease doing business demand did not insulate the Respondent from violating 8(b) (4) (B) of the Act.

"Because of the construction industry proviso, the Respondent did not violate Section 8(e) of the Act in seeking the agreement. However, the Respondent demanded that Merchandise cease doing business with the four non-union subcontractors, and was successful in that demand. The Board was correct in finding this economic action violated Section 8(b) (4) (B) of the Act. The findings and order of the Board are sustained. Enforcement of the Board's order is granted."

This Court recognizes that the Sixth Circuit decision is in conflict with the Ninth Circuit decision in Construction, Production and Main Lab. U. Local 383, A.F.L.–C.I.O. v. N.L.R.B., 323 F.2d 422 (1963), but is of the opinion that the decision of the Sixth Circuit is sound and should be followed by this Court. The Court concludes that the picketing by respondents to induce Kansas to terminate its subcontracts with those subcontractors who did not employ union labor was a violation of the Act and an unfair labor practice.

It is therefore ordered that an injunction be entered as requested by the petitioner and that the petitioner shall present to the Court and opposing counsel, an appropriate form of injunction for entry herein.